936 P.2d 655

**Elizabeth Ann LEE, a single woman, Plaintiff–Appellee/Cross–Appellant,**

**v.**

**Edwin I. AIU, a single man, Defendant–Appellee/Cross–Appellee,**

**and**

**Steven B. Dixon and Lucy Pearson–Dixon, husband and wife, Defendants–Appellants/Cross–Appellees**

**No. 18761.**

Supreme Court of Hawai'i.

April 15, 1997.

Eric A. Seitz, Honolulu, on the briefs, for defendants-appellants/cross-appellees Steven B. Dixon and Lucy Pearson–Dixon.

William J. Rosdil and Paul K. Hamano, Hilo, on the briefs, for plaintiff-appellee/cross-appellant Elizabeth Ann Lee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Following a jury trial, defendants-appellants/cross-appellees Steven B. Dixon and Lucy Pearson–Dixon [1] (collectively, the Dixons) appeal from the third circuit court's February 13, 1995 amended judgment, awarding plaintiff-appellee/cross-appellant Elizabeth Ann Lee general and punitive damages. Briefly stated, this case involves a dispute over the title to real property located at 702 Keha Place in Hilo, Hawai'i (the Keha Place property), breach of a purported settlement agreement entered into between Lee and defendant-appellee Edwin I. Aiu,[2] claims of tortious interference with the purported settlement agreement by the Dixons, intentionally tortious or negligent conduct by Dix-

on toward Lee, and Lee's emotional distress claims.

Lee cross appeals from that portion of the amended judgment entered in favor of the Dixons and Aiu with respect to reformation of the deed to the Keha Place property and in favor of Aiu with respect to the settlement agreement. Lee also cross appeals from the trial court's denial of her request for attorney's fees.

For the reasons discussed below, we vacate that portion of the amended judgment with respect to the deed and the settlement agreement and remand this case to the trial court with instructions to: (1) equitably reform the deed to the Keha Place property to reflect Lee as the sole owner; and (2) specifically enforce the settlement agreement. We affirm the trial court's denial of Lee's request for attorney's fees against Aiu. Additionally, we affirm in part that portion of the amended judgment with respect to the Dixons' liability to Lee on the tortious interference with contractual relations claim, but remand for a new trial on the issue of damages consistent with our holding that Lee be allowed to introduce, as an element of her damages, evidence of those attorney's fees she incurred in litigation with Aiu that were caused by the Dixons' tortious interference with the contractual relation between Lee and Aiu. Additionally, we affirm the jury's finding that punitive damages are warranted, but vacate the award and remand for a new trial to determine the amount of punitive damages consistent with our holding that Lee be allowed to introduce, as an element of punitive damages, evidence of those attorney's fees she incurred in litigation with the Dixons.

Finally, because it appears from the record that Dixon, a licensed attorney, engaged in conduct that may not comport with the Hawai'i Rules of Professional Conduct (HRPC), we refer this matter to the Office of Disciplinary Counsel (ODC) for review and appropriate action.

## I. BACKGROUND

According to the testimony adduced at trial, Lee met Aiu approximately one year after

---

1. Pearson–Dixon is now known as Lucy Larkin.

2. We note that Aiu has not made an appearance in this appeal.

her husband, Clifford Lee (Clifford), passed away. By May 1983, Lee and Aiu had become romantically involved, and Aiu took up residence with Lee and her minor daughter in Lee's Oxnard, California home a few months thereafter. Upon moving in, Aiu brought approximately $5,000.00 into the relationship and contributed to the maintenance of the home and living expenses from his employment earnings and military pension. Aiu acknowledged during his testimony that he "did not have . . . ownership in the Oxnard house."

As a result of many conversations Lee had with her brother-in-law, Wilbert Lee (Wilbert), who resided in Hawai'i, Lee decided to purchase a home in Hilo with proceeds from Clifford's life insurance and the sale of her two homes: the Oxnard residence and another house in Rhode Island. Aiu decided to move to Hawai'i with Lee, at least temporarily, until Lee and her daughter were settled in a new home. Both Lee and Wilbert testified that Lee had made it clear that, although Aiu was moving with her, it was her intention that she would finance the purchase of a new home and that she would be the sole owner.

The sale of the Oxnard home netted Lee $62,215.78. Because she was unable to be present at closing or during the move to Hilo, Lee instructed escrow to disburse $15,-000.00 of the net proceeds to Aiu to cover the moving expenses and to disburse the balance to her. Upon her subsequent arrival in Hilo, Lee deposited the $47,215.78 balance into a joint account with Aiu (the Merrill–Lynch account). Lee testified that she did not intend to make a gift to Aiu, but put his name on the account so that if anything happened to her, Aiu could carry out her intended purpose: to purchase a home in Hilo for her daughter. Using the proceeds from Clifford's life insurance and the sale of the Rhode Island home, Lee also established a similar account with Wilbert. Lee testified that she had no intention to make a gift to Wilbert and put his name on the account for the same reason that she put Aiu's name on the Merrill–Lynch account. While looking

for a home to purchase in Hilo, Aiu, Lee, and Lee's daughter [hereinafter, collectively, the threesome] stayed with Wilbert for a few months and then moved into a rental home. Eventually, the threesome located a suitable home at the Keha Place property. By that time, however, Lee was experiencing credit problems due to a stolen credit card and general financial difficulty.[3] According to Lee, Aiu offered to assist her in securing financing by co-signing the mortgage and the note. She testified that, because Aiu's name would appear on the mortgage papers, they believed that Aiu's name would also have to appear on the deed to the property.

In February 1986, Lee's offer to purchase the Keha Place property was accepted. It is undisputed that Lee made the $15,000.00 down payment exclusively from her own monies. She and Aiu then proceeded to sign all of the relevant documents as joint tenants with the right of survivorship. In response to the question whether Aiu "ever discuss[ed] the fact that [Aiu's] involvement in the purchase of a residence was to allow her to qualify for a loan[ ]," Aiu stated, "[T]hat was the key purpose."

The threesome moved to the Keha Place property and lived there together, off and on, until July 1990. Although Lee and her daughter lived in the home continuously, Aiu went back and forth between Hawai'i and California for employment purposes. Between 1985 and 1990, both Lee and Aiu contributed financially to the cost of the Keha Place property. Although Aiu made approximately $23,000.00 in mortgage payments, Lee testified that, during that period, Aiu, in conversations with various members of Aiu's family, referred to the Keha Place property as "the nice home that [Lee] had bought in Hilo."

Sometime in early 1989, the relationship between Lee and Aiu began to deteriorate. Lee testified that Aiu expressed a desire to remove his name from the deed and move back to California permanently. In July 1989, after a brief reconciliation, Lee testified that Aiu once again informed her that he was

---

**3.** The record indicates that, at the time, the Merrill–Lynch account balance had declined to ap- proximately $30,000.00.

leaving Hawai'i and requested that Lee reimburse him the $23,000.00 that he had contributed to the mortgage in exchange for his consent to remove his name from the deed. Lee refused, reminding Aiu of their agreement that the house was hers. The matter was dropped for several months until December 13, 1989, when Lee learned that she had breast cancer.

Lee underwent a radical mastectomy on December 29, 1989, was released from the hospital on December 31, 1989, and immediately began a nine-month course of chemotherapy. Toward the end of January 1990, Lee testified that Aiu again announced that he wanted to leave Hawai'i. According to Lee, Aiu, on this occasion, demanded $25,000.00 in exchange for his agreement to remove his name from the deed. When asked why he wanted to leave following Lee's surgery, Aiu testified that "[s]he wouldn't talk to me.... So it was like 180 degrees switch over from loving to ... a person that ... had problems. I told her then that a mastectomy to me if she loses a breast it doesn't matter if she loses a breast...." He also testified, however, that "my feelings were that she had the problems.... I respected her very much but the mastectomy really turned me off to her. I don't know why."

In January 1990, following Lee's surgery, Aiu moved out of Lee's bedroom, and their communication became very limited. Aiu testified that, because Lee would not talk to him, he began communicating with her by way of notes. His notes contained, *inter alia*, repeated demands for $25,000.00 to reimburse him for his share of the mortgage payments.

Feeling harassed and badgered, Lee turned to Wilbert for counsel. He advised her that, "[i]f this is a joint tenancy and you have cancer, whoever predeceases the other will leave the survivor everything. That means [your daughter is] out. If he's asking for $25,000.00, the easier of anything may be to give him what he wants." Lee testified that it was at that point that she acquiesced and promised to give Aiu $25,000.00, and Aiu, in turn, promised not to pursue joint tenancy status by agreeing to remove his name from the deed [hereinafter, the settlement agree-

ment]. Thereafter, Lee and Aiu discussed the logistics of how Aiu would be paid, eventually deciding that they would sell the house. From the net proceeds of the sale, Aiu would be paid $25,000.00, and the balance would be disbursed to Lee. With this plan in mind, Lee and Aiu executed a listing agreement on February 12, 1990.

Aiu, however, decided that he should consult an attorney and therefore met with Dixon, a licensed attorney, on March 22, 1990. Aiu and Dixon initially contemplated that Dixon and his wife, both of whom were realtors, "might take a listing for sale on the house." The fee agreement between Aiu and Dixon reflects that Aiu paid Dixon $600.00 and that any additional fees would be paid to Dixon out of Aiu's share of the proceeds of the sale of the Keha Place property. Dixon characterized the $600.00 as an "attorney/or/broker commission to be determined by client Edwin K. Aiu whether this is an attorney fee retainer or brokerage commission."

Dixon advised Aiu that Aiu's equity in the property was probably about fifty to fifty-five thousand dollars and that Aiu would be ill-advised to waive his rights to it. Although Dixon disavowed any knowledge of the settlement agreement between Lee and Aiu, Dixon testified that he advised Aiu not to sell to anyone for $25,000.00 "[be]cause it was worth twice that." Moreover, Dixon's notes of the March 22, 1990 meeting with Aiu contain the notation "[w]illing [to] take 25K." Dixon further testified that Aiu told him: (1) "[w]ell, I might take 25,000 from [Lee] just to settle this whole mess"; and (2) "at one point I was willing to take 25."

Lee testified that sometime after executing the listing agreement, Aiu suggested that, rather than sell the house, she could take out a $25,000.00 loan to pay him. Thus, they canceled the listing agreement, and Lee applied for a loan; however, she was unable to qualify. Although Wilbert agreed to co-sign the loan, Aiu objected to Wilbert's involvement. Consequently, Lee and Aiu returned to their original plan to sell the house.

Wilbert, who was also a real-estate broker, testified that, on May 3, 1990, he spent sever-

al hours with Lee and Aiu drafting a new listing agreement for the sale of the Keha Place property. In the section marked "special terms" on the listing agreement, the following statement appears:

(1) upon the successful completion of a sales transaction, net proceeds to sellers shall be:

(a) twenty-five thousand dollars to Mr. Edwin K. Aiu, and

(b) the balance to Elizabeth A. Lee.

Wilbert testified that the information he wrote on the listing agreement form "was coming from both [Lee and Aiu] and after they came to an agreement I said, fine ... this is what you agreed to .... [a]nd this is what we put down." According to Wilbert, Aiu indicated that he wanted to take the listing agreement to an attorney, "[b]ut he had essentially agreed to everything here. And that's why it was put down.... [Aiu] told me that everything was acceptable to him."

Dixon testified that, on May 4, 1990, Aiu brought the unsigned listing agreement to his office for review.[4] Dixon, as reflected in his notes, advised Aiu to "retain [an] independent broker, not talk to other parties but allow attorney to handle, advise E[dwin] A[iu] not to waive any rights." Dixon also testified that he gave the listing agreement back to Aiu and understood that Aiu presented it, unsigned, to Lee. According to Wilbert, Dixon had called him on May 4, 1990, advising that he (Dixon) wished to co-list the property.

Subsequent to his meeting with Dixon, Aiu informed Wilbert that his attorney did not agree with the listing contract and also that Aiu was entitled to fifty percent of the property. Lee testified that, after Aiu took the

listing agreement to Dixon, he brought it back with the terms lined out and indicated that the listing agreement was not acceptable.

On May 16, 1990, after "much discussion between [them]," Wilbert drafted a Deposit, Receipt, Offer, and Acceptance (DROA) pursuant to Lee and Aiu's instructions, "all of which were put in writing here so that it would be good reference for everybody to see." By its terms, Lee would pay Aiu $25,000 in return for his release of any interest in the Keha Place property. Aiu drafted a handwritten note, to be attached to the DROA, which stated:

[Lee] would like a copy for *assurance* of special term of house sale;

(To be attached to DROA).

This offer also includes the following provision:

On completion of sale, escrow is hereby instructed to pay directly to Edwin K. Aiu, $25,000, for his partnership to 702 Keha Place house.

Aiu signed the note, leaving a space for the date and took the DROA and the note to Dixon. Dixon testified that, because Aiu did not want to agree to the terms, Dixon wrote "rejected" across the face of DROA.

On July 3, 1990, Aiu delivered a handwritten note to Dixon at his office, stating: "[I] would like to sell my share of house (partnership) for the amount agreed upon earlier." Dixon testified that he was not aware of any earlier agreement Aiu had made with anyone and never asked Aiu what "the amount agreed upon earlier" meant. Despite his own advice to Aiu that $25,000 was a "ridiculous" offer for his interest, Dixon, along with his wife, Pearson–Dixon, offered to buy Aiu's interest for $25,000.00. Aiu accepted. In a

---

4. Aiu, however, testified that he had never seen the listing agreement until it was produced by Lee in discovery, that he was not present when Wilbert drafted it, and that he never had any intention of settling with Lee for $25,000.00. However, one of Aiu's signed, handwritten notes to Lee was introduced at trial. It contained, *inter alia*, the following passages:

All I ask is $25,000.00 to dissolve our partnership, or my share of the partnership, even though it is worth *twice* that amount.

There are a couple of ways to do this:

(1) $25,000 and a "quit claim" deed;
(2) Sell the house, and present me with $25,000 out of the net[.]
If there is friction or hostile occurrence then:
(1) 50% split of the net on the house
. . . .
I have given you terms to solve our problems and dissolve our partnership. I ask for less than half of what you will net or what it is worth, and yet you hesitate.... There are other avenues that I could use but they are harsh and I refrain from these recourses.

document prepared by Dixon for Aiu's signature, dated July 13, 1990, Dixon "worked out the numbers at the top and showed [Aiu] that his equity was worth about $53,[5]00; and if we paid him $25,000 for it, we would, apparently, have a windfall of $28,500." The document further stated that:

> Ed Aiu acknowledges that the purchase price and interest rate is substantially below market value, Aiu wants Steve and Lucy Dixon to buy his interest in the house and understands that as his lawyer S.B. Dixon has a conflict of interest in this self dealing transaction and Aiu waives that conflict of interest and understands that Aiu has the right to retain independent legal counsel.

Aiu testified that he did not know, and Dixon did not tell him, the meaning of the phrases "conflict of interest" and "self dealing transaction," but he signed the document anyway because Dixon was his lawyer, Dixon told him to sign it, and, at the time, he (Aiu) was under stress and not thinking straight and had communicated that fact to Dixon. The Dixons gave Aiu $4,000.00 and a promissory note for the balance of $21,000.00, to be paid upon sale of the Keha Place property, and Aiu executed a warranty deed.

A few days thereafter, without telling Lee what he had done, Aiu moved to the mainland. Just prior to his departure, Aiu, in response to Lee's inquiry, advised her to simply call him when the house was sold to discuss the payment of his $25,000.00. Lee did not learn about the arrangement between Aiu and the Dixons until Pearson–Dixon wrote her a letter, declaring the Dixons' ownership of a one-half undivided interest in her house. The letter also advised Lee that, because the Dixons had not assumed the mortgage, Lee must continue to pay the mortgage or risk foreclosure. In her letter, Pearson–Dixon also cautioned Lee not to commit waste and suggested that Lee consider a lower selling price for the house in order to achieve a faster sale. Following receipt of the letter and consulting with her attorneys,

Lee filed the present action against Aiu and the Dixons on September 7, 1990.

After some discovery, Lee filed an amended complaint on March 25, 1992. The five counts of the amended complaint alleged the following claims for relief:

I: Equitable Reformation of Deed (reformation);

II: Breach of Settlement Agreement/Judicial Enforcement of Settlement Agreement (breach of settlement agreement);[5]

III: Negligent/Intentional Infliction of Emotional Distress (NIED/IIED);

IV: Tortious Interference with Contractual/ Advantageous Relationship (TICR); and

V: Intentional Tort/Malice, Bad Faith, Negligent Conduct (malice).

All of the aforementioned claims for relief ultimately survived two motions for summary judgment, as well as a motion to bifurcate counts I and II from the remaining counts, and trial was scheduled to commence on March 21, 1994.

On March 21, 1994, the day jury selection was scheduled to begin, the Dixons filed a motion to strike Lee's jury demand and, alternatively, renewed their motion for bifurcation. The Dixons urged the trial court to resolve the threshold equitable issues separately, before any evidence was presented to the jury, because,

> if the Court does not rule in her favor on the equitable claims, Ms. Lee will have no legal claims, and the litigation will be over since, if Mr. Aiu was a joint tenant, and there were [sic] no valid contract to specifically perform, neither Mr. Dixon nor Ms. Dixon could be held liable for interfering with something that did not exist.

After hearing argument on the motion, the trial court orally ruled as follows:

> My proposal, as I suggested last week, was to have the jury give an advisory opinion to the Court on the two matters to which they are—to which plaintiff's [sic]

---

**5.** The First Amended Complaint referred to the agreement between Lee and Aiu as an "accord and satisfaction and/or compromise and settlement." Although sometimes referred to as an accord and satisfaction, the Lee/Aiu agreement was characterized throughout the proceedings as a settlement agreement and, therefore, will be referred to as such throughout this opinion.

are not entitled to a jury decision, and that to take the jury decision as to the remaining three matters which, in my opinion, do give rise to jury triable issues. . . .

I think the best way to proceed is to allow all of the evidence to come out and that I'll make a decision on the matters involving Mr. Aiu, and at the close of evidence, and then we will decide on the jury instructions, if appropriate, and the special verdict form, if appropriate, and the only matters for the jury will be the remaining three against the Dixons. . . .

At the close of evidence we're going to make a decision on who's going to decide what as against these—as to all these issues. There are five. And also, that following the decision on that matter, the Court may immediately thereafter decide those matters which the Court feels must be decided by the—by the judge.

Jury selection began immediately following the hearing. At the close of Lee's case, the Dixons and Aiu moved for entry of judgment on the equitable issues in favor of the defendants and alternatively, for a directed verdict. The court denied the motion, stating:

The Court is going to deny all motions for directed verdict. The basis of the denial is that the law is very clear that I must take this motion in light most favorable to the non-moving party and view the evidence in a light, again, most favorable to the non-moving parties. And I do so. I believe that there has been a sufficiency of evidence to support taking this matter before the jury and accordingly I deny the motions.

Just to advise the parties, that pursuant to Rule 39(c) [of the Hawai'i Rules of Civil Procedure (HRCP)], this Court will take all issues—rather, counts one [ (reformation) ] and two [ (breach of settlement agreement) ] in an advisory capacity to the jury. But this court has every intention of making the decisions on those two counts. Those are not jury triable issues. And the court will make the decisions.

The Dixons and Aiu again moved for a directed verdict at the close of the defendants' portion of the case, which was again denied on the same basis. During closing argument, with respect to the TICR claim, Lee suggested that the jury award her $28,-500 in damages based upon the "windfall" that Dixon had calculated:

Now the question is what are these amounts of damages [for TICR]. One of the exhibits that you're going to see . . . is a document that was admitted by Mr. Dixon, he wrote up, and was sign[ed] by Mr. Aiu. And what he shows up here is that when you sell your undivided interest to him, Mr. Aiu, and you only have to pay $25,000 as far as his calculations are concerned based upon a value of $165,000, he's got [about] $28,500. That's what he's making. That's his profit. That would have been [Lee's]. To me this is clearly the amount of damages.

The jury returned its verdict on March 29, 1994. In answer to the first five questions on the special verdict form, the jury found that: (1) at the time the Keha Place property was purchased, Lee and Aiu agreed that Lee would be the sole owner and that Aiu would be on the title in name only; (2) there was a binding and enforceable agreement between Lee and Aiu wherein Aiu agreed to sell his rights and interests in the Keha Place property for $25,000.00; (3) Aiu breached that agreement; (4) Lee suffered damages as a result of the breach; (5) such damages amounted to $15,000.00.

The jury also awarded Lee: (1) $10,000.00 in emotional distress damages; (2) $28,500.00 for TICR; (3) $28,500.00 for "interference with prospective advantage"; (4) $28,500.00 for "intentional tortious conduct"; (5) $25,-000.00 in punitive damages against Dixon; and (6) $15,000.00 in punitive damages against Pearson–Dixon.

Subsequent to receiving the jury's special verdict, the trial court struck the jury's findings as to the first five questions on the verdict form dealing with the reformation and breach of settlement claims, stating:

With respect to count one which is [Lee's] claim for reformation, the Court is going to enter judgment in favor of Defendant for these reasons. It is clear from the evidence adduced that all of the documentary evidence supports the finding of a

joint tenancy and not a sole ownership. This would include the deed, mortgage documents. Also, payment by—of the mortgage by the Defendant Aiu albeit some made from joint accounts and joint funds indicate the intent of the parties, in my own mind, to proceed jointly. This of course is consistent with the documentary evidence and also consistent with other courses of conduct testified to by both Miss Lee and Mr. Aiu. In my own mind the most persuasive evidence was [Lee's] testimony in which she the described [sic] relationship and many of the things they did together. Most importantly, looking for a home over the course of almost one year. Her description was they looked for a home jointly that they both agreed on. For these reasons the Court feels that as to count one [Lee] has not met her burden.

As to count two, accord and satisfaction the Court is also entering judgment in favor of defendant for these reasons. There is no question in my mind that there is a bona fide dispute, which [is] one of the elements of accord and satisfaction. However, by definition, accord is the promise to undertake the payment of an obligation. And the testimony and the evidence shows that while the parties agreed to an exchange of $25,000 in consideration of removing an interest—Mr. Aiu's interest from the property, an important and critical part of accord and satisfaction would have necessitated the understanding and promise to undertake the payment of the mortgage as well. And there was testimony by Miss Lee that such an agreement or such a discussion never took place. Furthermore, there was never any performance on the accord and satisfaction. And therefore the elements are not met.

Accordingly, the Court will strike the jury's responses to questions numbers one, two, three, four, and five.

On April 5, 1994, the Dixons filed a motion for judgment notwithstanding the verdict (JNOV), or, in the alternative, for a new trial as to the claims for TICR, NIED/IIED, and malice. The Dixons argued that the trial court, by its rulings on the reformation and breach of settlement agreement claims, had already concluded that the jury's verdict was against the weight of the evidence as to critical elements of Lee's case against the Dixons. In other words, in order to prevail on the TICR claim, Lee was required to establish the critical element of the existence of a contract in the first instance. Because the court found that there was no binding and enforceable agreement between Lee and Aiu, the jury's finding regarding the TICR claim could not stand. Carrying this argument one step further, the Dixons also asserted that, absent a TICR claim, there existed no relationship between the Dixons and Lee upon which a NIED/IIED or malice claim could rest. The motion was denied.

On February 13, 1995, the court entered an amended judgment dismissing counts I (reformation) and II (breach of settlement agreement) and awarding Lee damages in the amount of $49,691.35 [6] on the remaining counts, as well as punitive damages in the amount of $25,000.00 against Dixon and $15,000 against Pearson–Dixon. The Dixons' notice of appeal and Lee's notice of cross-appeal were timely filed.[7]

## II. *DISCUSSION*

Of the many issues raised by the Dixons and Lee, we address the following issues, which are dispositive of this case:

1. The Dixons' argument that there was no basis for awarding TICR, NIED/IIED, malice, and punitive damages because the trial court ruled in their favor on the equitable issues; and

**6.** Although not specifically delineated in the judgment itself, it appears from the record that $11,357.35 of the $49,691.35 was awarded as costs. Moreover, nowhere in the record is there any explanation of how the court arrived at the figure of $49,691.35 or $38,334.00, if the reference to $11,357.35 in costs is correct. We note also that damages awarded to Lee by the jury as indicated on the special verdict form are in excess of

$150,000.00. Nevertheless, Lee does not raise as a point of error on appeal the fact that the amended judgment awards her a damage amount inconsistent with that reflected on the special verdict form.

**7.** Aiu did not appeal from the judgment of the trial court.

2. Lee's arguments that the trial court erroneously (a) contradicted the factual findings of the jury by ruling against her on the reformation and breach of settlement agreement claims, (b) refused to award attorney's fees against Aiu and the Dixons, and (c) refused to permit the jury to consider the amount of her attorney's fees when determining punitive damages.

## A. *Legal Versus Equitable Issues—General Principles*

The Dixons argue that the trial court should have decided the reformation and breach of settlement agreement issues first because they were equitable in nature. The Dixons also argue that the TICR, NIED/IIED, and malice claims were predicated upon a finding that a settlement agreement existed and that, because the trial court found that no such enforceable agreement existed, it therefore erred in denying the Dixons' motions for directed verdict and JNOV or new trial.

Lee, on the other hand, maintains that, in determining whether to grant the equitable relief sought, the trial court was required to submit all factual determinations regarding her legal claims to the jury and that any findings of fact common to both the equitable and legal claims were binding on the trial court in its equitable determinations. Lee therefore submits that the trial court, having failed to find that the jury's factual determinations were unsupported by the evidence, erred when it disregarded the jury's factual findings as to the equitable reformation and breach of settlement agreement claims.

We begin our analysis by considering (1) which issues were required to be tried before a jury and (2) whether the jury's factual findings on those issues were binding on the trial court in its determination of issues that were not triable as of right to a jury. Such an inquiry presents a question of law, which we review *de novo*. *See Mehau v. Reed*, 76 Hawai'i 101, 869 P.2d 1320 (1994); *Kimball v. Lincoln*, 72 Haw. 117, 809 P.2d 1130 (1991).

Article I, section 13 of the Hawai'i Constitution guarantees that, "[i]n suits at common law where the value in controversy shall exceed five thousand dollars, the right of trial by jury shall be preserved." HRCP Rule 38(a) provides that "the right of trial by jury as given by the Constitution or a statute of the State or the United States shall be preserved to the parties inviolate."

■ The right given by the Hawai'i Constitution and preserved by HRCP Rule 38(a) is the right to a jury trial in *suits at common law*.

The test to determine whether a suit is "at common law" is . . . whether the cause of action seeks "legal" or "equitable" relief. In other words, courts look to the nature of the remedy to determine whether a jury trial is warranted. Historically, actions in equity were heard by a judge; actions at law were triable by a jury.

*Mehau*, 76 Hawai'i at 110, 869 P.2d at 1329 (citations omitted). Furthermore, "[i]t is well settled that a jury question goes to the particular *issue* rather than the overall case." *Id.* at 111, 869 P.2d at 1330 (citation omitted) (emphasis added); *see also* HRCP Rule 39.

■ Where legal and equitable claims are present in the same case, this court has long held that the trial court is precluded from ruling, in the first instance, on any equitable claims that may determine the outcome of the legal claims. *Harada v. Burns*, 50 Haw. 528, 445 P.2d 376 (1968). In the federal courts, there is no question that, when legal and equitable issues turn on the same operative facts, a jury must decide the legal issue first. *See, e.g., United States v. Williams*, 441 F.2d 637 (5th Cir.1971).

■ Furthermore, when a jury is called upon to make findings in connection with both legal and equitable matters resting upon the same set of facts, the trial court is bound by the jury's findings of fact when making its equitable determinations. *See, e.g., Zions First Nat. v. Rocky Mountain Irrigation Inc.*, 795 P.2d 658, 662 (Utah 1990); *International Harvester Credit v. Pioneer Tractor*, 626 P.2d 418, 421 n. 2 (Utah 1981) (citation omitted); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *see generally* Charles A.

Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 2305, 2306, & 2338 (1971).

### B. *The Legal and Equitable Issues in this Case*

■ Lee sought monetary damages with respect to the TICR, NIED/IIED, malice, and, as alternative relief, breach of settlement agreement claims—all of which involve legal issues, triable as of right to a jury. And, because some of the findings regarding the legal claims would be dispositive of the equitable claims, the trial court was required to try the legal matters to the jury first. *Williams*, 441 F.2d at 637. For example: (1) the existence of a contract/settlement agreement was a factual determination common to both the breach of settlement agreement claim and the TICR claim; and (2) the existence and worth of Aiu's putative joint interest was a factual determination common to both the equitable reformation claim and the damages element of the TICR claim. *See Kimball*, 72 Haw. at 126, 809 P.2d at 1134–35 .(the determination of an interest in land and any damages incidental thereto is a legal determination for the jury). Once the jury made factual determinations regarding the legal claims, the trial court was bound by those findings in its determination of the equitable claims. *Zions First Nat.*, 795 P.2d at 662.

■ In this case, the jury found, *inter alia*, that: (1) Lee and Aiu did not intend to take the property as joint tenants; (2) Lee and Aiu had entered into a settlement agreement;[8] (3) Aiu breached that agreement; (4) Lee suffered monetary damages as a result of the breach; and (5) such damages totaled $15,000.00. In order for the trial court to ignore the jury's findings, as indeed it did, it would necessarily have had to determine that such findings were not supported by the evidence. *Kimball*, 72 Haw. at 129, 809 P.2d at 1136; *see also Kainea v. Kreuger*, 30 Haw. 860, 870 (1929).[9]

Because both the equitable and legal matters in this case rested upon the same set of operative facts, the trial court's decision to reverse the jury's verdict was the functional equivalent of granting a motion for directed verdict or for JNOV.

■ It is well settled that a trial court's rulings on

directed verdict or JNOV motions [are reviewed] *de novo*. Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.

In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable

---

8. The Dixons, relying on the statute of frauds, argue that the settlement agreement was unenforceable because the agreement involved the transfer of an interest in land and it was not evidenced by a sufficient writing. This argument is without merit. The jury found that Aiu did not have any such interest in the Keha Place property, a finding which we hold, *infra*, must be upheld. Aiu himself testified that he was simply seeking reimbursement for his contributions to the mortgage. The fact that he threatened to disregard the "key purpose" of placing his name on the deed, that is, to assist Lee in financing her home, did not invest him with an interest in the Keha Place property. And, assuming *arguendo* that the settlement agreement was required to be in writing, because it resolved a dispute regarding real property, Aiu's handwritten notes to Lee and the listing agreements were sufficient writings to evidence the agreement between Lee and Aiu.

9. The *Kainea* court held that,

[w]here a party is entitled by express provision of law to a trial by jury of issues of fact and it is not discretionary with the court to direct an issue or refuse it, the verdict of the jury is generally regarded in the same light as the verdict of a jury in a common-law action, and the chancery court is bound by it and cannot disregard it *except under the same circumstances as would justify the judge in the law court in setting aside a verdict in a common-law action.* Where a distinct legal issue, on which a party to an equity suit is entitled to a jury trial as of right, is tried by a jury, the verdict will be given the same force as in ordinary jury trials, and will not be set aside but will be regarded as conclusive between the parties, *unless the court has specified that it is palpably against the evidence.*

30 Haw. at 870 (citations omitted) (emphases added).

to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Carr v. Strode,* 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995) (quoting *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994)) (brackets in original). Thus, "[w]here there is conflicting evidence, or there is insufficient evidence to make a one-way verdict proper, [JNOV] should not be awarded." *Id.* at 487, 904 P.2d at 501 (internal quotations and citations omitted).

■ An examination of the record reveals that the jury was presented with the following evidence: (1) Lee's testimony that (a) the property was intended to belong solely to Lee, (b) Aiu's name appeared on the deed only because Lee and Aiu had mistakenly believed it to be a condition precedent to co-signing the note, and (c) in conversations with various members of his family, Aiu referred to the Keha Place property as "the nice home that [Lee] had bought in Hilo"; (2) Aiu's testimony that Lee attempted to secure a loan, rather than sell the house, to pay him the $25,000.00; (3) Wilbert's testimony regarding his involvement in working on the special terms of a listing agreement that reflected Lee and Aiu's agreement; and (4) Aiu's handwritten notes, as well as the DROA, reflecting Aiu's promise to vacate the premises and release any interest he may have had in the Keha Place property in exchange for $25,000.00.

Based upon our review of the record, we believe there was substantial evidence to support the jury's findings with respect to Counts I and II. We therefore hold that the trial court erred when it entered judgment contrary to such findings. Consequently, we reinstate the jury's findings with respect to Count I (reformation) and remand this case with instructions that the trial court enter an order equitably reforming the deed to reflect Lee as the sole owner of the Keha Place property. *See Carman v. Athearn,* 77 Cal. App.2d 585, 175 P.2d 926, 932 (Cal.Ct.App. 1947) (holding that "reforming the writ[ing] by making it conform to what the court was convinced, and the evidence show[ed], had

been the true intent of the parties, but which had by mutual mistake or the fraud of defendant been incorrectly expressed," was an appropriate remedy). Because Aiu did not have an interest in the Keha Place property, he had nothing to transfer to the Dixons; thus, they too have no interest in the Keha Place property.

We also reinstate the jury's findings with respect to Count II (breach of settlement agreement) insofar as it found that an agreement existed wherein Lee would pay Aiu $25,000.00 in return for the removal of his name from the deed and that Aiu breached that agreement. Because, on remand, the deed will be equitably reformed to reflect Lee as the sole owner, the Dixons no longer stand to gain a "windfall" inasmuch as they have no interest in the Keha Place property. Thus, Lee has suffered no monetary damages as a result of Aiu's breach, and the appropriate remedy is specific enforcement of the agreement. Consequently, we instruct the trial court to enter an order specifically enforcing the settlement agreement, that is, removal of Aiu's name from the deed—an act that will be accomplished through equitable reformation—and payment of $25,000.00 by Lee to Aiu.

■ In conjunction with her breach of settlement agreement claim, Lee has requested an award of attorney's fees under HRS § 607-14 (1993), which provides that the prevailing party, *inter alia,* in actions in the nature of assumpsit, shall recover attorney's fees against the losing party not to exceed twenty-five percent of the judgment. *State ex rel. Bronster v. United States Steel Corp.,* 82 Hawai'i 32, 56 n. 7, 919 P.2d 294, 318 n. 7 (1996). A suit to enforce an agreement is a suit for specific performance and is not an action in the nature of assumpsit. "[A]ssumpsit is a common law form of action for the recovery of damages for non-performance of a contract." *Smothers v. Renander,* 2 Haw.App. 400, 401, 633 P.2d 556, 559 (1981). Although Lee requested damages as alternative relief, we have determined that specific performance of the agreement is the remedy consistent with equitable reformation of the deed. Hence, because Lee's claim for specific enforcement is not an action in as-

sumpsit, we affirm the trial court's denial of her request for attorney's fees against Aiu under HRS § 607–14.

C. *The Remaining Legal Issues (The TICR, NIED/IIED, Malice, and Punitive Damages Claims )*

Relying on essentially the same arguments that they made in their April 5, 1994 motion for JNOV, discussed *supra,* the Dixons argue that the trial court erred in accepting the jury's verdict with respect to the TICR, NIED/IIED, malice, and punitive damages claims after having ruled against Lee on the equitable issues. The Dixons maintain that, once the trial court ruled in Aiu's favor on the equitable claims, they were entitled to a directed verdict or JNOV in their favor on the remaining issues. The Dixons, however, raise other arguments, discussed *infra,* directly challenging the jury's verdict on all of the remaining claims, presumably in anticipation of an adverse ruling by this court. Having indeed concluded that the trial court erred in finding for Aiu on Counts I and II, we now address the arguments raised by the Dixons and Lee on the remaining claims, with the exception of malice. We need not address the malice claim further as Dixon (to whom Count V applies exclusively) raises no additional arguments on appeal.

### 1. The TICR Claim

■ The requisite elements of TICR are: (1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach the contract; (4) the absence of justification on the defendant's part; (5) the subsequent breach of the contract by the third party; and (6) damages to the plaintiff.

*Weinberg v. Mauch,* 78 Hawai'i 40, 50, 890 P.2d 277, 287 (1995).

■ The existence of a contract/settlement agreement between Lee and Aiu, and Aiu's breach thereof, are established. *See supra* section II.B. Based upon our examination of the record, we believe that there is substantial evidence to support the jury's findings that the Dixons were cognizant of

the settlement agreement between Lee and Aiu and that they intentionally proceeded to encourage Aiu to breach that agreement by convincing him to enter into a new contract with them. The evidence further supports the finding that the Dixons were without justification, that is, that they were motivated only by their own personal gain. This is particularly so in light of: (1) Dixon's advice to Aiu that $25,000.00 for Aiu's putative interest in the Keha Place property was a ridiculous sum of money and that Aiu would be ill-advised to honor it; and (2) the Dixons' subsequent acquisition of Aiu's putative interest for that same "ridiculous" sum.

However, because we have directed the trial court to reform the deed to reflect Lee as the sole owner, Lee may now sell the property and reap all profits therefrom. Her damages, which the jury found to be $28,500.00 (that is, the amount of the "windfall" that the Dixons' might have realized as a result of their tortious interference with the settlement agreement) are therefore negated.

■ Lee, however, argues that the trial court erred in refusing to allow her to introduce evidence of her attorney's fees incurred in litigating with Aiu as an element of damages in her TICR claim. We agree. Normally, pursuant to the "American Rule," each party is responsible for paying for his or her own litigation expenses. *Survivors of Medeiros v. Maui Land & Pineapple Co.,* 66 Haw. 290, 296, 660 P.2d 1316, 1320 (1983); *Thornley v. Sanchez,* 9 Haw.App. 606, 618, 857 P.2d 601, 608 (1993). This general rule, however, is subject to a number of exceptions: attorney's fees are chargeable against the opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent. *Id.* As a matter of precedent, other jurisdictions have recognized that attorney's fees are chargeable against the wrongdoer in the context of a TICR claim. *See, e.g., Dassance v. Nienhuis,* 57 Mich.App. 422, 225 N.W.2d 789 (1975); *Prospero Assocs. v. Redactron Corp.,* 682 P.2d 1193 (Colo.Ct.App. 1983). Although not in the context of a TICR claim, this court has applied the exception where the wrongful act of the defendant

causes the plaintiff to litigate with a third party. In *Uyemura v. Wick*, 57 Haw. 102, 551 P.2d 171 (1976), we held that,

> where the wrongful act of the defendant[, (in this case, the Dixons' TICR),] has involved the plaintiff in litigation with [another, (in this case, Aiu)], or placed [the plaintiff] in such relations with others as makes it necessary to incur expenses to protect his [or her] interest, such expenses, *including attorneys' fees*, should be treated as the legal consequences of the original wrongful act, and may be recovered as damages.

*Id.* at 108–09, 551 P.2d at 176 (emphasis added); *see also Restatement (Second) of Torts* § 914(2)(1979) [hereinafter, *Restatement* ].[10]

■ Thus, where the wrongful act of a defendant causes a plaintiff to engage in litigation with a third party in order to protect his or her rights or interests, attorney's fees incurred in litigating with that third party may be chargeable against the wrongdoer as an element of the plaintiff's damages.[11] *Id.* at 110, 551 P.2d at 176.

> In order to recover attorneys' fees under this principle, the plaintiff must establish: (1) that the plaintiff had become involved in a legal dispute either because of a breach of contract by the defendant, or because of defendant's tortious conduct, that is, that the party sought to be charged with the fees was guilty of a wrongful or negligent act or breach of agreement; (2) that the litigation was with a third party, not with the defendant from whom the fees are sought to be recovered; (3) that the attorneys' fees were incurred in that third-party litigation; and (4) whether the fees and expenses were incurred as a result of defendant's breach of contract or tort, that they are the natural and necessary consequences of the defen-

dant's act, since remote, uncertain, and contingent consequences do not afford a basis for recovery[.]

*Uyemura*, 57 Haw. at 109, 551 P.2d at 176 (citations omitted).

■ As previously discussed, Lee became involved in a legal dispute with Aiu because of the Dixons' tortious interference with the contractual relation between Lee and Aiu. As a natural and necessary consequence of the Dixons' tortious interference, Lee was required to litigate with Aiu, which in turn caused her to incur attorney's fees. Although some jurisdictions have held that this exception to the American Rule does not apply where the plaintiff consolidates his or her actions against both the contract breacher (in this case, Aiu) and the tortfeasor (in this case, the Dixons), we are in accord with those jurisdictions that hold that it is of no consequence whether the actions are brought together or separately. As aptly stated by the Colorado Court of Appeals, we see "no reason why attorneys' fees should be recoverable when the aggrieved party files separate lawsuits against the contract breacher and the tortfeasor, but should be denied when he [or she] consolidates both into one law suit." *Prospero Assocs.*, 682 P.2d at 1199.

In such a case, the jury will be required to make a determination as to that portion of attorney's fees incurred by the plaintiff in the consolidated action that is attributable to the plaintiff's litigation with the third party, that is, Lee's litigation with Aiu. For purposes of clarity, we note that our holding in this section does *not* also entitle Lee to include the attorney's fees she incurred in litigating with the Dixons as an element of her TICR damages. In order to recover those attorney's fees from the Dixons, she must establish an independent exception; otherwise, the general rule that one is responsible for his or her

---

**10.** Section 914 of the *Restatement, supra,* entitled "Expense of Litigation," provides:

> (1) The damages in a tort action do not ordinarily include compensation for attorneys' fees or other expenses of the litigation.
> (2) One who through the tort of another has been required to act in the protection of his [or her] interests by bringing or defending an action against a third person is entitled to recov-

er reasonable compensation for loss of time, attorneys' fees and other expenditures thereby suffered or incurred in the earlier action.

**11.** Lee also argues that the Dixons' are responsible for the attorney's fees she incurred in litigating with them. However, we address that question in connection with our discussion regarding punitive damages. *See infra* section II.C.3.

own litigation expenses applies. On the facts of this case, Lee has successfully demonstrated that she is entitled to recover the attorney's fees she expended in litigating with the Dixons. *See infra* section II.C.3.

Accordingly, with regard to the TICR claim, we affirm the trial court's finding of liability, but vacate the damage award and remand with instructions to retry the issue of damages. On remand, Lee will be permitted to introduce, as an element of her damages, evidence of any attorney's fees that she incurred in litigation with Aiu that were caused by the Dixons' tortious interference with the contractual relation between Lee and Aiu.

### 2. NIED/IIED Claims

■ The Dixons argue that emotional distress damages are not sustainable because Lee has failed to prove that she suffered a *physical* injury; however, Lee also asserted a claim for IIED, which does not require proof of physical injury. The elements of IIED are: "(1) that the act allegedly causing harm was intentional; (2) that the act was unreasonable [or outrageous [12]]; and (3) that the actor should have recognized that the act was *likely to result in illness*." *Marshall v. University of Hawaii*, 9 Haw.App. 21, 38, 821 P.2d 937, 947 (1991) (citation omitted) (emphasis added).

■ As previously discussed, we believe that there was substantial evidence that the Dixons intentionally interfered with the settlement agreement. We also believe, based on our review of the record, that there was substantial evidence to support the jury's finding that Lee suffered emotional distress. With respect to the Dixons' conduct, the jury was presented with the following evidence: (1) Pearson–Dixon's letter to Lee (a) informing Lee that the Dixons now owned half of her home, (b) cautioning Lee to continue paying the mortgage or risk foreclosure, (c) instructing Lee not to commit waste, and (d) suggesting that Lee lower her selling price in order to accomplish a faster sale. The evidence also established that Aiu had related to Dixon that Aiu wished to leave Lee because

she had changed since having been diagnosed with breast cancer and undergoing chemotherapy and that Aiu found it unbearable to live with her. Based on such evidence, and on the present record, it was reasonable for the jury to have found that the Dixons' conduct was "outrageous" and that such conduct "was likely to result in illness." *Id.*

### 3. Punitive Damages

■ Finally, the Dixons argue that the evidence cannot sustain an award of punitive damages against them. We disagree. Punitive damages are not compensatory in nature; rather, they are designed to punish a defendant for "aggravated or outrageous misconduct" and to deter that defendant from similar conduct in the future. *Masaki v. General Motors Corp.*, 71 Haw. 1, 6, 780 P.2d 566, 569, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1989). On the facts discussed in the previous section regarding the IIED claim, we hold that the present record contains substantial evidence from which the jury could find that the Dixons engaged in aggravated or outrageous misconduct. We therefore affirm the jury's award of punitive damages against both Dixon and Pearson–Dixon.

On cross-appeal, Lee argues that she should have been permitted to introduce evidence of attorney's fees she incurred in litigation with the Dixons because punitive damages may be used as a method of paying an injured party's attorney's fees. We note that, in our seminal decision regarding punitive damages, this court recognized that other jurisdictions have held that "paying the plaintiff's attorneys' fees" is one of the purposes of punitive damages. *Masaki*, 71 Haw. at 8, n. 2, 780 P.2d at 572, n. 2. Recently, relying on *Masaki* and on the trend in the majority of our sister states, the Intermediate Court of Appeals held that "we adopt the majority view that a jury should be allowed to consider a plaintiff's attorney fees in determining the amount of a punitive damages award." *Kunewa v. Joshua*, 83 Hawai'i 65, 77, 924 P.2d 559, 571 (App.1996); *see also*

---

12. The terms "unreasonable" and "outrageous" have been used interchangeably and have been construed to mean "without just cause or excuse

and beyond all bounds of decency." *Chedester v. Stecker*, 64 Haw. 464, 468, 643 P.2d 532, 535 (1982).

*Romero v. Hariri,* 80 Hawai'i 450, 911 P.2d 85 (App.1996). When considering attorney's fees in calculating the amount of the punitive damage award, the fee amount must be "reasonable and necessary." *Jolley v. Puregro Company,* 94 Idaho 702, 496 P.2d 939, 947 (1972).

 Attorneys' fees cannot be awarded in addition to exemplary damages; rather, they must constitute the whole of the punitive damage award or be accounted for as a portion of the total punitive damage award. 22 Am.Jur.2d § 808 (1988); *Romero,* 80 Hawai'i at 458–59, 911 P.2d at 93–94 (affirming the trial court's ruling that "the motion for attorneys' fees is denied inasmuch as the Court finds that the punitive damages will cover, not only the punishment and deterrence aspect, but [also payment of the plaintiff's attorney's fees]"). And, "[w]hether to award punitive damages and the determination of the amount are within the sound discretion of the trier of fact, whether judge or jury." *Restatement, supra,* § 908, comment (d).

 Therefore, because facilitating payment of a plaintiff's attorney's fees is one of the purposes of punitive damages, we hold that the trial court erred in prohibiting Lee from presenting the jury with evidence of her attorney's fees incurred in litigating with the Dixons. We therefore affirm the jury's finding that punitive damages are warranted, vacate the award of $25,000.00 against Dixon and the award of $15,000.00 against Pearson–Dixon, and remand with instructions to retry

the issue of punitive damages. On remand, Lee will be permitted to introduce, as an element of punitive damages, evidence of any attorney's fees that she incurred in litigation with the Dixons.

### III. *REFERRAL TO THE ODC*

As previously stated, it appears from the record in this case that Dixon engaged in conduct that may not comport with the HRPC.[13] We are therefore compelled to refer the record of this case to ODC for its review and appropriate action. *See Bettencourt v. Bettencourt,* 80 Hawai'i 225, 909 P.2d 553 (1995) (referring record to ODC where it appeared appellate counsel engaged in conduct prohibited by the HRPC).

### IV. *CONCLUSION*

For the reasons discussed above, we vacate that portion of the amended judgment with respect to the deed and the settlement agreement and remand this case to the trial court with instructions to: (1) equitably reform the deed to the Keha Place property to reflect Lee as the sole owner; and (2) specifically enforce the settlement agreement. We affirm the trial court's denial of Lee's request for attorney's fees against Aiu. Additionally, we affirm in part that portion of the amended judgment with respect to the Dixons' liability to Lee on the tortious interference with contractual relations claim, but remand for a new trial on the issue of damages consistent with our holding that Lee be allowed to introduce, as an element of her damages,

---

13. *See, e.g.,* HRPC Rules 1.2(a), 1.8(a), 1.8(j), and 8.4(c), which provide in relevant part:

 **RULE 1.2 SCOPE OF REPRESENTATION**
 (a) ... A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. ...
 **RULE 1.8 CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS**
 (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
 (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

 (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
 (3) the client consents in writing thereto.
 . . . .
 (j) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:
 (1) acquire a lien granted by law to secure the lawyer's fee or expenses; and
 (2) contract with a client for a reasonable contingent fee in a civil case.
 **RULE 8.4 MISCONDUCT**
 It is professional misconduct for a lawyer to:
 . . . .
 (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
 (Bold emphasis in original.)

evidence of those attorney's fees she incurred in litigation with Aiu that were caused by the Dixons' tortious interference with the contractual relation between Lee and Aiu. Additionally, we affirm the jury's finding that punitive damages are warranted, but vacate the award and remand for a new trial to determine the amount of punitive damages consistent with our holding that Lee be allowed to introduce, as an element of punitive damages, evidence of those attorney's fees she incurred in litigation with the Dixons.

Furthermore, in connection with the above-described conduct of attorney Steven B. Dixon, we refer the matter of Supreme Court No. 18761 as well as Civil No. 90–347 to the ODC for its review and appropriate action. We direct the Clerk of the Supreme Court to transmit a certified copy of this opinion to the ODC. We further direct all clerks of the several courts of this state to make available the records of the aforementioned cases for the ODC's review and to provide certified copies, at no cost, of any documents requested by the ODC in connection with its investigation of this matter.