ZIONS FIRST NATIONAL BANK,
Plaintiff and Appellee,

v.

ROCKY MOUNTAIN IRRIGATION, INC.,
Valley View Enterprises, Inc., Grant S. Cooper, and Ruby Cooper, et al., Defendants and Appellants,

v.

Vern H. HASLAM, Third–Party Defendant and Appellee.

No. 20985.

Supreme Court of Utah.

July 12, 1990.

Earl S. Spafford, Lynn C. Spafford, Julian D. Jensen, Salt Lake City, for Rocky Mountain Irrigation, Inc.

R. Willis Orton, Adam M. Duncan, James R. Holbrook, John A. Beckstead, Wallace R. Bennett, Salt Lake City, for Zions First Nat. Bank.

John Spencer Snow, Salt Lake City, and Herm Olsen, Logan, for receiver.

Joseph Chambers, Logan, for defendant Gifford Hill and Co.

William L. Fillmore, Logan, for defendant Hastings Irrigation.

Bruce M. Hale, Salt Lake City, for defendant State Tax Com'n.

Bruce L. Jorgensen, Logan, for defendants Harold and Gloria Thomson.

Brent Ward, C. William Ryan, William Hansen, Salt Lake City, for defendants U.S. and Small Business Administration.

DURHAM, Justice:

Defendants-appellants Rocky Mountain Irrigation, Inc., Valley View Enterprises, Inc., Grant S. Cooper, and Ruby Cooper (collectively "Rocky Mountain") appeal a partial directed verdict and related findings by the court for plaintiff-appellee Zions First National Bank ("Zions") and third-party defendant and appellee Vern H. Haslam ("Haslam"). Rocky Mountain also appeals the trial court's denial of leave to amend the pleadings to conform to evidence presented at trial and refusal to give certain jury instructions relating to the proffered amended claims. We reverse in part, affirm in part, and remand for retrial of those issues affected by our reversal, as discussed below.

The action underlying this appeal is a consolidation of several lawsuits involving claims by both Rocky Mountain and Zions arising out of their banking relationship. In the mid- and late–1970s, Rocky Mountain was a supplier and manufacturer of sprinkler irrigation equipment and systems. It relied on First National Bank of Logan ("the Bank") for capital loans as its business expanded and for short term credit to cover temporary cash flow shortages caused by delays in collecting receivables. During the course of the business relationship, the Bank merged with Zions, which assumed all assets and liabilities. Haslam was the Bank's president and, after the merger, a senior vice president at Zions. He personally handled Rocky Mountain's accounts.

By early 1979, the Bank and Rocky Mountain both wanted a more convenient credit arrangement so that the Coopers would not have to come into Logan so often—two to three times per week—to sign new notes for advances to Rocky Mountain. On the advice of an outside bank examiner, Haslam suggested that Rocky Mountain open a revolving line of credit with the Bank. This was the first time the Bank had used such an arrangement with one of its customers. On June 4, 1979, the Coopers signed a "master note" in the face amount of $350,000 securing $349,552.03 of existing indebtedness. This note created a revolving line of credit. The line of credit was extended to $435,000 by an additional $85,000 note executed on November 27, 1979.

The notes creating the revolving line of credit bore different fixed rates of interest. Both notes were on preprinted forms with typed insertions for the relevant parties, interest rates, dates of execution, etc. Both notes also contained the following language, typed in a separate paragraph off to one side:

Future advances against this note and the collateral securing it will be made at variable rates of interest depending upon the prime rate at the time.

Rocky Mountain contended at trial that this paragraph was an "alteration" of the notes—that it was added after the notes were executed. Zions contended that the paragraph was on each note at the time it was signed.

From mid-June 1979 through October 1981, when these lawsuits were filed, about three million dollars were advanced and repaid on this revolving credit line. During this time, Rocky Mountain built a new store and expanded its business to include sales of groceries, hardware, and other goods in addition to irrigation equipment. It borrowed money to build and stock its store.

By the summer of 1981, Rocky Mountain's businesses were in trouble. Its remaining credit on the revolving line was sometimes insufficient to cover its day-to-day needs; checks presented by its suppliers were periodically dishonored by Zions. On October 9, 1981, Rocky Mountain filed suit against Zions for breach of contract with regard to the line of credit, wrongful dishonor of checks, and damage to its businesses. On October 13, 1981, Zions filed suit against Rocky Mountain to enforce notes, to take possession of collateral under security agreements, and to foreclose mortgages, all of which had been given by Rocky Mountain to secure various loans,

including the revolving line of credit. In the complaint, Zions declared Rocky Mountain to be in default and accelerated all of the indebtedness. Zions had a receiver appointed by the district court and took possession of the collateral.

These actions, and two others not the subject of this appeal and involving additional parties, were consolidated by the trial court. Zions was aligned as plaintiff, with Rocky Mountain as defendant and counterclaimant. Rocky Mountain later brought in Haslam as a third-party defendant when it amended its counterclaim to include a claim under the Utah Racketeering Influences and Criminal Enterprises Act (RICE).

Rocky Mountain raises three categories of claims on appeal. It claims that the trial court improperly (1) denied Rocky Mountain's right to a jury trial on the issue of the alleged "material and fraudulent" alteration of the two notes by reserving the issue to itself and then ruling against Rocky Mountain as to its affirmative defense and directing a verdict as to the RICE counterclaim and third-party claim; (2) refused to allow Rocky Mountain to amend its pleadings to incorporate claims of common law fraud, breach of fiduciary duty, and attempted theft by deception allegedly tried by implicit consent of the parties; and (3) refused to give certain jury instructions based on these claims when requested by Rocky Mountain.

## I. RIGHT TO JURY TRIAL ON ALTERATION OF NOTES

At a pretrial hearing, the court ruled that the issue of whether the two notes creating the line of credit were fraudulently altered was for the court to determine.[1] It may have been unclear at the time whether this order included determination of the issue as it related to Rocky Mountain's *claims*, as opposed to affirmative defenses, which defenses were specifically

mentioned in the order. At the close of trial, the court made clear that its findings against Rocky Mountain on the issue would be binding on the jury, but also went on to direct a verdict on that issue.

Apparently, the trial court reasoned that its equitable jurisdiction over Zions' foreclosure action precluded the jury from considering any matters related to the underlying debt. In an ordinary foreclosure, and as to the six notes Zions sued on that were not part of the line of credit, the trial court's approach does not present any problem. Although the existence of a debt is a triable legal issue in contract law, a trial court's equitable jurisdiction over foreclosure extends to the existence of the debt underlying the mortgage being foreclosed. *Cf. Dugan v. Jones*, 615 P.2d 1239, 1243 (Utah 1980). Before the advent of rules pleading, this equitable jurisdiction over a legal issue would have been incidental or concurrent.[2]

The distinction between issues triable at law and those triable in equity serves to delineate the scope of the right to a jury trial under our case law. In *International Harvester Credit Corp. v. Pioneer Tractor & Implement, Inc.*, 626 P.2d 418 (Utah 1981), we held that article I, section 10 of the Utah Constitution guarantees the right to a jury trial in civil cases. In *Hyatt v. Hill*, 714 P.2d 299 (Utah 1986), we made it clear that this constitutional right to a jury trial in civil cases extends only to cases that would have been cognizable at law at the time the constitution was adopted.

Rocky Mountain was the first of the parties to bring suit. Because of the later realignment of the various actions by the court, Rocky Mountain's claims were transformed into affirmative defenses and counterclaims. This realignment could not have changed, and did not change, the nature of any issue from legal to equitable. Rocky Mountain should have been afforded its right to a jury trial on the issue of whether

1. Rocky Mountain has properly appealed this pretrial order.

2. Utah has had only one form of civil action since statehood. *See* Utah Const. art. VIII, § 19; Rev.Stat.Utah § 2852 (1898) (tit. 73, ch. 1). Rules pleading, however, did not emerge until 1951. Utah R.Civ.P. 1.

the two notes creating the line of credit were materially and fraudulently altered. Such a claim raised by a plaintiff at the time our constitution was adopted would have been triable to a jury. *See, e.g., Petty v. Clark*, 102 Utah 186, 189–91, 129 P.2d 568, 569–70 (1942). The facts that the claim also constituted an affirmative defense to a foreclosure and that foreclosures were tried in equity at the time the constitution was adopted do not change the issue from legal to equitable.

■ In *International Harvester*, we noted that our analysis was in harmony with that of the United States Supreme Court on the issue of the right to a jury trial in civil cases when equitable issues are also involved. *International Harvester*, 626 P.2d at 421 n. 2. In the federal courts, there is no question that when legal and equitable issues turn on the same operative facts, a jury must decide the legal issue first; the jury's factual determination binds the trial court in its determination of the parallel equitable issue. *See, e.g., Lytle v. Household Manufacturing, Inc.,* — U.S. —, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), *cited with approval in International Harvester; see generally* C. Wright & A. Miller, *Federal Practice and Procedure* §§ 2305, 2306, 2338 (1971). We approve of this procedure.

■ The trial court should not have reserved the issue of fraudulent alteration to itself. The court compounded its error by directing a verdict on the issue as it related to the RICE counterclaim. There is abundant evidence in the record to support a finding of material, fraudulent alteration, especially when viewed in the light most favorable to Rocky Mountain. The trial court should have given the issue to the jury unless reasonable minds could not have found the facts to support material and fraudulent alteration of the notes. *See Management Comm. of Graystone Pines Homeowners Ass'n v. Graystone Pines,*

*Inc.,* 652 P.2d 896, 897–98 (Utah 1982). The trial court decided the issue based on its conclusion that the alleged alterations were not material because they only affected future advances. It found that the added paragraph was simply evidence of a course of dealing that applied to future advances.

This reasoning is incorrect under the facts of this case and our law. Utah Code Ann. § 70A–3–407(1) (1980) provides, "Any alteration of an instrument is material which changes the contract of any party thereto in any respect...." The trial court reasoned that the underlying obligation was unchanged by the future advances clause. This reasoning ignores the trial court's own findings that show the underlying obligation had been paid off long before Zions sued on the notes. The two notes were evidence of a contract that created a revolving line of credit, and when Zions sued on those notes, it was to recover amounts owed that were actually "future advances" with respect to the original notes.[3]

The future advances clause was material because it altered the revolving credit contract by changing the applicable interest rate for credit secured by the note from the fixed rate shown on the note's face to a variable rate dependent on a fluctuating prime. The $350,000 note bore a fixed rate of 15.25 percent, while the amounts sued on under that note bore interest rates ranging from 20 percent to 23 percent according to the record and the trial court's findings. Because the trial court erroneously found that the alterations were not material, it did not reach the fraud issue.

■ There is sufficient evidence in the record to have gone to the jury on the fraud issue. In fact, in the course of ruling on Zions' motion for a directed verdict at the close of trial (and out of the jury's presence), the trial court spoke approvingly of the credibility of the most compelling evidence of fraud—the testimony of Rocky Mountain's documents expert. This expert

---

**3.** The record and the trial court's findings show that no advances were made against the $85,000 note of Nov. 27, 1979. Nonetheless, it was part of the revolving credit contract and is therefore subject to the defense of material and fraudulent alteration.

testified that both future advances clauses were typed at the same time on the same typewriter. He further testified that this typewriter was not the same one used to prepare the notes themselves. This testimony came after the jury had heard evidence—undisputed by Zions—that the notes were executed six months apart, that the Bank (these notes were prepared well over a year before the merger with Zions) was not equipped to handle and had never used variable rates, and that the Coopers' carbon copy of the notes did not contain the future advances clause. The court went so far as to remark during the hearing of Zions' directed verdict motion that the logical conclusion was that the future advances clause was added to both notes at some time after the preparation of the $85,000 note. The trial court did not so conclude only because under its theory such a finding was irrelevant. Given the Coopers' testimony that the notes did not contain the future advances clause when signed, that they would not have agreed to such a clause, and that Rocky Mountain's carbon copy of the $350,000 note (in evidence) did not contain the clause, the jury might have reasonably inferred that Zions (or the Bank) tried to protect itself from rising interest rates at the expense of Rocky Mountain without Rocky Mountain's consent. There is credible evidence in the record to support every element of fraud, including the inference of intent.

The trial court should have allowed the jury to decide the material, fraudulent alteration issue, and as to the two notes creating the line of credit, the court should not have ruled on enforcement, the right to collateral, or foreclosure until it had the jury's verdict. It should then have deferred to that verdict in making its rulings.

## II. AMENDMENT OF PLEADINGS; JURY INSTRUCTIONS

■ These issues are treated together because the trial court indicated to Rocky Mountain toward the close of trial that any amendment of the pleadings (to conform to evidence) could be done by giving jury instructions covering Rocky Mountain's theo-

ries if warranted. We approve of this procedure. Rocky Mountain presented various proposed jury instructions that were not given. It here appeals only the failure to give instructions on common law fraud, attempted theft by deception, construction of contracts against the framer, and the existence of a fiduciary duty between a bank and its client.

Zions argues that the proposed instructions on common law fraud and attempted theft by deception covered theories that were not pleaded; nor were these the theories tried by consent of the parties. This argument is without merit. Zions does not contend that the issues of fraudulent alteration of documents and theft by deception were not properly tried. Those two issues fairly encompass most of the evidence needed to support instructions on common law fraud and attempted theft by deception. The pleadings also included a defective count of common law fraud. Zions did not object to the evidence which specifically supports these two requested instructions, and the record does show sufficient evidence to support them.

■ Our rules of civil procedure *require* that the pleadings be conformed to the evidence presented at trial when no objection is made to the introduction of such evidence. Utah R.Civ.P. 15(b); *see Poulsen v. Poulsen,* 672 P.2d 97 (Utah 1983) (mandatory for trial court to grant leave to amend to conform to evidence); *General Ins. Co. v. Carnicero Dynasty Corp.,* 545 P.2d 502, 505–06 (Utah 1976) (failure to object to evidence outside scope of pleadings is implied consent to try issue raised by such evidence). The trial court has no discretion to deny such an amendment. *General Ins. Co.,* 545 P.2d at 506. By not giving the proposed instructions on common law fraud and attempted theft by deception, the trial court failed to comply with rule 15(b). Furthermore, our case law requires that the trial court instruct the jury on each party's theory of the case so long as it is supported by competent evidence. *See, e.g., Powers v. Gene's Bldg. Materials, Inc.,* 567 P.2d 174, 176 (Utah 1977); *Pacific Chromalox Div. v. Irey,* 787

P.2d 1319, 1328 (Utah Ct.App.1990). None of the instructions given covered these two theories. Of course, the trial court could not have given the common law fraud instruction under its view of the facts and law, *see* part I above, but the failure to give the attempted theft by deception instruction is curious, given that the trial court did instruct the jury on theft by deception. The distinction between these two theories—attempt vs. actual theft—was critical in this case because the evidence on charging unlawful interest rates was very strong, while evidence on actual collection of unlawful interest was weak.

Zions argues on appeal that none of the proposed jury instructions are properly in the record. The record on appeal is voluminous and poorly organized. In fact, the record lacked many important items, some of which were indexed but not included (i.e., the jury instructions actually given). Furthermore, neither party to this appeal has done a good job of making clear and accurate citations to the record. Rocky Mountain has attached copies of the proposed instructions to its addendum, however, and between the addenda filed by both parties and the transcript of the hearings on jury instructions, all of the relevant jury instructions are before us.

■ Zions also argues that Rocky Mountain's objections were too vague to meet the specificity required by rule 51. *See* Utah R.Civ.P. 51. In support of its argument, Zions cites excerpts from the record of the hearing on jury instructions. Upon a review of the entire post-evidence record, it is clear to us that Rocky Mountain's summary rehearsals of its objections, cited to by Zions, came on the heels of lengthy discussion of each contested point, leaving no room for doubt in the trial court's mind as to the nature of each objection. Rocky Mountain's objections were sufficiently preserved for our review.

■ Rocky Mountain's "construction against the framer" instruction also should have been given. Rocky Mountain carefully explained its view that the future additions language setting variable interest rates "depending upon the prime" should be construed to make the variability of the interest rate charged on advances depend on the variability of the prime rate. The evidence showed that in fact Zions charged rates on advances that changed with the prime *and* at various margins above the prime. The rates charged ranged from 3 to 5 percentage points above the prime rate. Rocky Mountain's theory was that by taking advantage of the ambiguous language in the future advances clause, Zions charged unlawful interest for purposes of the RICE claim.

The trial court made no finding on the issue of ambiguity. Zions did not offer any extrinsic evidence on the meaning of the phrase "depending upon the prime." The trial court simply found the amount owing on each advance by using the interest rate charged by Zions. Rocky Mountain did not offer extrinsic evidence on the meaning of the phrase because it attempted to prove that the whole clause was added by Zions without its consent. Under Rocky Mountain's theory, the phrase could not have a consensus meaning. Given this posture, the requested instruction complies with our law on resolution of ambiguities against the framer of a contract. *See, e.g., Sears v. Riemersma,* 655 P.2d 1105, 1107 (Utah 1982).

■ Zions' final contention is that the denied jury instruction on breach of fiduciary duty is not supported by the facts or Utah law. We agree. Although we decline to decide whether a bank can develop a fiduciary relationship with its borrower, our review of the record convinces us that no such relationship existed between Haslam (as Zions' agent) and the Coopers (Rocky Mountain). Because of the factual context and the uncertain state of our law, the trial court properly rejected this proposed instruction.

### III. CONCLUSION

The findings and rulings of the trial court with respect to the two notes setting up the line of credit are vacated. The jury's verdict is reversed as to the RICE claim. The case is remanded for a jury

trial limited to (1) the validity of, enforceability of, and liability (if any) on the two notes, including the issues of common law fraud and fraudulent alteration of an instrument; and (2) the RICE claim against both Zions and Haslam. This opinion does not affect any other part of the judgment.

HALL, C.J., HOWE, Associate C.J., ZIMMERMAN and BILLINGS, JJ., concur.

STEWART, J., does not participate herein; BILLINGS, Court of Appeals Judge, sat.