**2013 UT App 229**

# THE UTAH COURT OF APPEALS

SKYPARK AIRPORT ASSOCIATION, LLC; J.R. PROPERTY
MANAGEMENT, LLC; SLH, LLC; TAYLOR AIR, LLC; TIM CORBITT;
AND CINDY CORBITT,
Plaintiffs and Appellees,
*v.*
JAY JENSEN AND ELEANOR JENSEN,
Defendants and Appellants.

Opinion
No. 20110648-CA
Filed September 19, 2013

Second District, Bountiful Department
The Honorable Glen R. Dawson
The Honorable Rodney S. Page
No. 020801861

Jerrald D. Conder, Attorney for Appellants
Jeffrey L. Silvestrini, Edward T. Vasquez, and
Justin D. Hatch, Attorneys for Appellees

JUDGE JAMES Z. DAVIS authored this Opinion, in which JUDGES
GREGORY K. ORME and CAROLYN B. MCHUGH concurred.

DAVIS, Judge:

¶1     Defendants challenge various rulings made by the trial court
in the course of litigation between Defendants and Skypark Airport
Association, LLC (SAA).[1] We affirm.

---

1. Although other plaintiffs are parties to this appeal, we refer to
both Skypark Airport Association, LLC individually and all the
plaintiffs collectively as SAA for convenience.

BACKGROUND

¶2    In 1979, Skypark Development (the Developer) owned an airport (the Airport) and an industrial park (Skypark) in Woods Cross, Utah. At that time, the Developer executed and recorded a document titled Declarations of Covenants, Conditions and Restrictions of Skypark Industrial Park (the 1979 Declaration), which gave the Skypark lot owners access to the Airport subject to various covenants, conditions, and restrictions (CCRs). Paragraph IV of the 1979 Declaration provided, "No Building Site or Lot within Skypark shall be used for or as an airport or for commercial aviation purposes or to provide airport services, such as those usually associated with a fix-based operation, fuel, sales, maintenance and mechanical services, aircraft sales, leases, charters, flying lessons and related services."

¶3    The 1979 Declaration created a management committee (Skypark Landowners Association) to maintain Skypark's common areas, enforce CCRs, and levy assessments against the lot owners as necessary. The 1979 Declaration also granted the Developer, as well as its successors and assigns, the authority to levy and enforce an annual assessment against Skypark lot owners to maintain the Airport facilities outside the perimeter of Skypark.

¶4    The 1979 Declaration defined voting rights of the lot owners within the Skypark Landowners Association. Skypark lot owners were classified as Class A members, and the Developer was classified as the sole Class B member. Class A members were entitled to one vote for each lot they owned. The Class B member was entitled to five votes for each lot it owned. The 1979 Declaration provided for Class B membership to be converted to Class A membership when either the total number of Class A votes equaled the total number of Class B votes or ten years had passed since the 1979 Declaration was recorded, whichever came first. The 1979 Declaration stated that it could "be amended in whole or in part at any time by a 2/3rds vote of all the total of the Class A and Class B votes which may be in existence at the time, . . . and such Amendment shall be and become effective immediately upon recordation of the same."

¶5    In 1981, the Developer sold the Airport and seventy of eighty-three total Skypark lots to Woods Cross Air Park (Woods Cross). In 1985, Woods Cross unilaterally executed and recorded a Declaration Concerning Airport Operation and Maintenance (the 1985 Declaration), which contained extensive provisions relating to the calculation and levying of assessments by the "Airport Owner," defined as "the party which at the time concerned is the Owner of the runway which comprises part of the Airport Facilities," which, at that time, was Woods Cross. The 1985 Declaration also stated,

> The provisions of this Declaration are intended to be in lieu of, rather than in addition to, . . . (d) Those provisions of the [1979] Declaration which provide for the "Developer's" . . . assessment of Lots in Skypark Industrial Park, a subdivision, for purposes of paying or defraying various costs associated with the Airport Facilities. One of the purposes of this Declaration is to increase, beyond the number contemplated by the [1979] Declaration, the number of parties participating in costs associated with the Airport Facilities. . . . [The] rights, powers, and responsibilities of the "Developer" (as distinguished from the "Association") under the [1979] Declaration as are related to the provisions referred to in the foregoing item (d), shall henceforth and at all times be the rights, powers, and responsibilities of the Airport Owner.

¶6    Skypark Airport, Inc. purchased the Airport from Woods Cross in 1987, "subject to 'matters of record' as well as specifically to the [1985 Declaration]." In 1996, SAA purchased the Airport from Skypark Airport, "subject to 'all covenants, conditions, restrictions, easements, rights-of-way and reservations of record or discoverable by inspection.'" Between 1997 and 2001, Defendants paid assessments to SAA.

¶7    In 1997, the owners of several Skypark lots consolidated and subdivided their lots into a planned unit development called Skypark Hangars East. Skypark Hangars East was subject to a

declaration (the 1997 Declaration), which, like the 1979 Declaration, contained CCRs restricting commercial operations in the development, including "selling aviation fuel, motor fuel, and jet fuel." An Amended Declaration for Skypark Hangars East (the 1999 Declaration), which was executed by Defendants, was recorded in 1999. The 1999 Declaration also restricted commercial activity, including "fuel sales," and clarified that the lot owners of units in Skypark Hangars East also remained subject to the 1979 Declaration.

¶8      SAA has sold fuel in Skypark since 1999. In September 2002, Defendants began selling fuel in Skypark Hangars East. SAA brought suit against Defendants to enforce the fuel sales restrictions in the 1979, 1997, and 1999 Declarations.

¶9      In 2006, the parties filed cross-motions for partial summary judgment. The trial court granted SAA's motion, in part, by declaring that SAA was the successor to the Developer and entitled to enforce the 1979 Declaration "subject to other defenses yet to be resolved." The trial court denied the remainder of SAA's motion for partial summary judgment as well as Defendants' motion for partial summary judgment because it concluded that there were disputed factual issues that precluded summary judgment.

¶10      In 2008, SAA filed a second motion for partial summary judgment on the enforceability of the 1985 Declaration. The trial court granted that motion, concluding that the 1985 Declaration was a validly executed amendment to the 1979 Declaration. However, the trial court clarified that its "ruling should not be read as concluding that the 1979 and 1985 Declarations are valid and enforceable for all purposes" because "Defendants [had] raised other defenses, including abandonment and waiver," which were ultimately reserved for the jury's consideration.

¶11      In May 2009, the trial court held a pretrial conference at which it informed the parties that it intended to bifurcate the trial so that the trial court, rather than the jury, would consider the issues of "fees, amount of assessments and wrongful lien." Defendants filed a motion requesting that the trial court reconsider

the ruling and permit the jury to hear the wrongful lien issue, but the trial court denied their motion. A couple of weeks later, a jury trial was held, and the jury determined that SAA had not waived, abandoned, or acquiesced its right to enforce the 1979 Declaration, as amended by the 1985 Declaration. In August 2009, the trial court rejected Defendants' wrongful lien claims as a matter of law in light of the jury's determination that the 1979 and 1985 Declarations remained enforceable. Defendants appeal.

ISSUES AND STANDARDS OF REVIEW

¶12    Defendants assert that the trial court erred in granting partial summary judgment in favor of SAA on the issue of whether it was a successor to the Developer and in denying Defendants' partial summary judgment motion based on its determination that disputed factual issues precluded summary judgment. They also argue that the trial court erred in granting SAA's second motion for partial summary judgment on the issue of whether the 1985 Declaration was a validly executed amendment. Summary judgment may be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730 (citation and internal quotation marks omitted).

¶13    Defendants also assert that they were denied their right to a jury trial on the wrongful lien issue when the trial court bifurcated the trial.

> Whether there is a right to a jury trial is a question of law that we review for correctness. However, "[i]t is the prerogative of the judge who actually tries the case to make the determination" of whether an issue is "one in equity or one in law wherein the party can

insist on a jury as a matter of right." Thus, "[u]nless
it is shown that the ruling [determining the equitable
or legal nature of the issue] was patently in error or
an abuse of discretion, this court will not interfere
with the ruling thereon."

*Kenny v. Rich*, 2008 UT App 209, ¶ 21, 186 P.3d 989 (alterations in
original) (quoting *Corbet v. Cox*, 517 P.2d 1318, 1320 (Utah 1974))
(additional citations and internal quotation marks omitted).


ANALYSIS

I. The Trial Court Did Not Err in Granting SAA's First Motion
for Partial Summary Judgment.

¶14     Defendants first challenge the trial court's February 7, 2007
grant of partial summary judgment to SAA. The trial court
determined that SAA

is the successor to the Developer as used in the 1979
Declaration and . . . that, subject to other defenses yet
to be resolved in this matter, SAA is entitled to
enforce the 1979 Declaration both as to the use
restrictions and as to the assessment powers granted
to the Developer, its successors and assigns.

¶15     Defendants first assert that the trial court's summary
judgment ruling was erroneous because any mutual easements or
servitudes created by the 1979 Declaration were extinguished when
Woods Cross acquired both the Airport and seventy of the eighty-
three Skypark lots. *See* Restatement (Third) of Prop.: Servitudes
§ 7.5 (2000) ("A servitude is terminated when all the benefits and
burdens come into a single ownership."). However, the trial court's
summary judgment ruling determined only that SAA was "the
successor to the Developer" and specifically concluded that SAA's
right "to enforce the 1979 Declaration" was "subject to other
defenses yet to be resolved." Accordingly, even accepting
Defendants' merger/unification argument as applicable, that

argument is irrelevant to the trial court's summary judgment ruling because the question of whether SAA is a successor to the Developer does not depend on whether the 1979 Declaration's CCRs remain enforceable.[2]

¶16    Defendants also raise other arguments relating to the continuing validity of the 1979 Declaration in support of their argument against the trial court's summary judgment ruling, including that the covenants in the 1979 Declaration were abandoned as a result of both the 1985 Declaration and a document they refer to as the Mendenhall Amendment.[3] However, like the merger/unification argument, these arguments are irrelevant to the trial court's partial summary judgment determination and were not foreclosed by that determination.

---

2. SAA asserts that Defendants did not preserve their merger/unification argument in the trial court, and Defendants have not pointed out where this argument was preserved. Even assuming that the argument was preserved, however, Defendants have not raised their merger/unification argument in any context other than that of challenging the trial court's determination that SAA is a successor to the Developer—the context in which we have determined it to be irrelevant. Therefore, it is unnecessary for us to consider this argument further.

3. The Mendenhall Amendment, signed in 1991, purports to amend the 1979 Declaration so as to grant one Skypark lot owner, Larry Mendenhall, the right to conduct commercial helicopter activities. In March 2002, SAA likewise entered into an agreement with Precision Air-Power, LLC, another Skypark lot owner, in which Precision Air-Power agreed to pay SAA for the right to provide certain services restricted by the 1979 Declaration for a fixed number of years. Defendants assert that these documents indicate that SAA abandoned the CCRs in the 1979 Declaration. However, as Defendants have not challenged the jury's determination that SAA did not waive, abandon, or acquiesce its right to enforce the CCRs, these documents are of little relevance to our analysis on appeal.

¶17 Defendants next assert that the 1979 Declaration unambiguously conferred the authority to enforce the 1979 Declaration exclusively on Skypark Landowners Association and provided for the termination of that authority within ten years of the 1979 Declaration's filing. Defendants maintain that SAA therefore cannot succeed the Developer as the entity entitled to enforce the 1979 Declaration. Defendants' assertion relies on Section V of the 1979 Declaration, which defines the Skypark lot owners' voting rights and the authority of the Skypark Landowners Association and the Developer to levy assessments. Defendants appear to construe this provision to mean that Skypark Landowners Association is the only entity entitled to enforce the 1979 Declaration and that the Developer's right to enforce was intended to be extinguished no later than the time when its Class B membership was converted to Class A membership. Based on this analysis, Defendants conclude that the Developer's rights were extinguished when it sold the airport and the remaining lots in Skypark to Woods Cross in 1981. They also argue that neither Woods Cross nor its successors-in-interest succeeded to any enforcement rights the Developer may have had because no development rights were included in the sale. Accordingly, they assert, there was no vertical privity between the Developer and SAA.

¶18 The logic of Defendants' apparent position is questionable and unsupported by authority.[4] Section V of the 1979 Declaration, on which Defendants primarily rely, anticipates the existence of successors-in-interest to the Developer when it states, "Reference in this paragraph to Developer shall also be construed to include its successors and assigns." Furthermore, Section XII of the 1979 Declaration explicitly grants a right to enforce the 1979 Declaration

---

4. In fact, we agree with SAA that there are times when it is not entirely clear what Defendants are arguing. *See generally State v. Gomez*, 2002 UT 120, ¶ 20, 63 P.3d 72 ("[A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research." (citation and internal quotation marks omitted)).

to the "Developer, the Association, or the Owner of any property subject to this Declaration, their heirs, successors and assigns for a term of ninety-nine (99) years from the date th[e] Declaration is recorded." Moreover, unlike Defendants, we do not read the provision regarding conversion of Class B membership to Class A membership as anticipating the extinguishment of any rights held by either Skypark Landowners Association or the Developer to enforce CCRs and levy assessments. Other than its vague assertion that SAA did not inherit the Developer's "development rights," Defendants have failed to explain why the rights of the Developer to levy assessments and enforce the 1979 Declaration did not pass to Woods Cross, to Skypark Airport, and then ultimately to SAA as successors-in-interest to the Developer. Accordingly, we affirm the trial court's grant of partial summary judgment on the question of whether SAA was the Developer's successor.

## II. The Trial Court's Denial of Defendants' Motion for Partial Summary Judgment Based on the Existence of Disputed Facts Is Not Reviewable.

¶19    Defendants also challenge the trial court's denial of their first motion for partial summary judgment. "In appealing a summary judgment ruling, only facts and legal theories that were *foreclosed* from being addressed at trial may be heard on appeal." *Wayment v. Howard*, 2006 UT 56, ¶ 20, 144 P.3d 1147. Thus, while "[a]ppellate courts may review the denial of a pretrial summary judgment motion if the motion was decided on purely legal grounds," *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 7, 215 P.3d 152, "[i]f there are material factual issues in dispute either at the time of the motion hearing or by the time of trial, the denial of the motion cannot be reviewed on appeal," *Hone v. Advanced Shoring & Underpinning, Inc.*, 2012 UT App 327, ¶ 6, 291 P.3d 832 (citing *Normandeau*, 2009 UT 44, ¶ 15). *See id.* ¶ 9 n.6 (noting that a "party who lost its motion for summary judgment has . . . more immediate remedies available" than appellate review after a full trial on the merits, "such as a petition for interlocutory review or a motion for judgment as a matter of law at trial (e.g., a directed verdict or for judgment notwithstanding the verdict)").

¶20    In this case, the trial court denied Defendants' motion for partial summary judgment because there were factual issues with respect to, inter alia, "waiver, abandonment and/or acquiescence by [SAA] in the use restrictions of the 1979, 1997 and 1999 Declarations."[5] Because the trial court denied Defendants' motion based on the existence of disputed factual issues rather than on purely legal grounds, the trial court's ruling is not reviewable on appeal.

### III. The 1985 Declaration Is Valid.

¶21    Defendants next challenge the trial court's grant of SAA's second motion for partial summary judgment on the issue of whether the 1985 Declaration was a validly executed amendment to the 1979 Declaration. Defendants assert that the 1985 Declaration was invalid because it was executed by only two signatories—Woods Cross and Mountain Fuel Supply Company.[6] Defendants further argue that the 1985 Declaration cannot be construed as an amendment to the 1979 Declaration because language in the 1985 Declaration indicated that its provisions were to be "in lieu of, rather than in addition to" certain provisions of the 1979 Declaration.

¶22    Because the 1979 Declaration states that it "may be amended in whole or in part at any time by a 2/3rds vote of all the total of the Class A and Class B votes which may be in existence at the time," and because Woods Cross owned seventy of the eighty-three Skypark lots at the time it executed the 1985 Declaration (or approximately 84%), the trial court determined that Woods Cross clearly had the votes to amend the 1979 Declaration. The trial court determined, based on our supreme court's decision in *Swenson v.*

---

5. Defendants have not challenged the jury's verdict on these issues.

6. The trial court explained that "Mountain Fuel Supply Company apparently owned land adjacent to the property at issue in this case, and its involvement is, therefore, not relevant to this analysis."

*Erickson*, 2000 UT 16, 998 P.2d 807, that signatures may be used in lieu of a formal vote and that, "[t]herefore, because Woods Cross . . . had enough voting power to control the outcome of the vote, it was entitled to unilaterally amend the 1979 Declaration by executing the 1985 Declaration." *See id.* ¶ 34 (suggesting that a petition signed by a majority of the owners in a homeowners association could potentially represent a majority vote of those owners). The trial court also pointed out that where a single voter constitutes a necessary majority, as in this case, "[t]here is simply no reason to require [a formal vote]." Defendants have not adequately challenged the trial court's analysis, having only vaguely asserted that the trial court employed "erroneous methodology."[7] Because Defendants have failed to explain why Woods Cross could not unilaterally amend the 1979 Declaration, we do not further consider Defendants' argument regarding the execution of the 1985 Declaration. *See generally State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that a reviewing court will not address arguments that are not adequately briefed.").

¶23 We also reject Defendants' argument that the "in lieu of" language in the 1985 Declaration precluded it from being an amendment to the 1979 Declaration. Defendants' argument appears to assert that only provisions intended to be "in addition to" rather than "in lieu of" the provisions of a document can constitute amendments. Black's Law Dictionary defines an "amendment" as "[a] formal revision or addition," "specif[ically], a change made by addition, deletion, or correction." *Black's Law Dictionary* 94 (9th ed. 2009); *see also id.* (defining "amend" as "[t]o change the wording of;

---

7. Defendants also assert that the trial court based its decision on its erroneous view that a different judge who ruled on the parties' first motions for partial summary judgment had declared the 1985 Declaration valid. However, while this may have been the trial court's opinion at the time of the hearing on the second motion for partial summary judgment, the record indicates that the trial court did not rely on the existence of a previous ruling in making its ultimate determination. Rather, the trial court conducted its own analysis of the issue from which it determined that the 1985 Declaration was valid.

specif[ically], to formally alter . . . by striking out, inserting, or substituting words"). Thus, any revision may constitute an amendment, not just additions. Furthermore, the "in lieu of" language does not suggest that the 1985 Declaration was intended to replace the entire 1979 Declaration, as Defendants seem to imply. Rather, the 1985 Declaration specifically identified provisions in the 1979 Declaration that it intended to replace. For all these reasons, we agree with the trial court that the 1985 Declaration constituted a valid amendment to the 1979 Declaration and, accordingly, affirm the trial court's grant of partial summary judgment on that issue.

## IV. Defendants Were Not Entitled To Have Their Wrongful Lien Claim Considered by the Jury.

¶24    Defendants assert that the trial court denied their right to a jury trial by refusing to let the jury hear their wrongful lien claims. Prior to trial, the trial court informed the parties, "The amount of assessments will not be submitted to the Jury. The issues that will be tried by the [court] are fees, amount of assessments and wrongful lien." Defendants requested that the trial court reconsider its ruling only with respect to the wrongful lien claim. The trial court denied that request, and the wrongful lien issue was not presented to the jury.

¶25    On appeal, Defendants assert that the jury should have been allowed to assess whether certain portions of the annual assessments levied against them by SAA were permissible under the Declarations. However, this is a different question than whether SAA filed a wrongful lien.

¶26    As the trial court pointed out, "Defendants have cited no authority supporting their argument that errors in the determination of the amount of the underlying obligation render any lien based thereon wrongful."[8] Indeed, whether a lien is

---

8. The cases cited by Defendants on appeal are not on point. In *Commercial Investment Corp. v. Siggard*, 936 P.2d 1105 (Utah Ct. App. 1997), the wrongful lien at issue was based on a buyer having filed

(continued...)

wrongful depends only on whether the lienor has the authority to record it. Utah Code Ann. § 38-9-1(6) (LexisNexis 2010). Thus, the fact that a lien may "ultimately prove unenforceable" does not make it wrongful.[9] *See Hutter v. Dig-It, Inc.*, 2009 UT 69, ¶ 52, 219 P.3d 918. Furthermore, "[t]he question of what constitutes a wrongful lien . . . is a legal question of statutory interpretation," *id.* ¶ 8, and is therefore a question that should be determined by the trial court rather than by a jury, *see Durham v. Duchesne Cnty.*, 893 P.2d 581, 584 (Utah 1995).

¶27    The question of whether specific assessments were authorized by the Declarations may have been an appropriate jury question. *See Zions First Nat'l Bank v. Rocky Mountain Irrigation, Inc.*, 795 P.2d 658, 661 (Utah 1990) (explaining that, depending on the circumstances, "the existence of a debt" may be either a legal or an equitable issue); *cf. Failor v. MegaDyne Med. Prods., Inc.*, 2009 UT App 179, ¶ 14, 213 P.3d 899 (explaining that "an action for an accounting may be legal or equitable[] depending upon the facts set out in the pleadings" and that "[t]he necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law" (omission and first alteration in original) (citations and internal quotation marks omitted)). But Defendants never challenged the trial court's determination that the "amount of assessments" was an issue to be determined by the court. Nor do

---

8. (...continued)
a Notice of Interest against thirty-eight acres of property when he was entitled to purchase only sixteen acres. *See id.* at 1110–11. In *Swan Creek Village Homeowners Ass'n v. Warne*, 2006 UT 22, 134 P.3d 1122, the validity of assessments was challenged as a defense to an action against an owner for failing to pay assessments, not as evidence of wrongful lien. *See id.* ¶ 1. Neither of these cases suggests that an error in the amount of the underlying obligation renders a lien wrongful.

9. Defendants assert that this rule applies only to mechanics' liens but do not provide any support for this assertion.

the Defendants challenge the trial court's ultimate ruling on the bifurcated issues.[10] Accordingly, we decline to consider this issue further.

## CONCLUSION

¶28    The trial court did not err in granting partial summary judgment to SAA on the issue of whether SAA was a successor to the Developer. The question of whether the trial court properly denied Defendants' motion for partial summary judgment is not reviewable by this court because it was based on the trial court's determination that disputed material facts precluded summary judgment and the issue was ultimately resolved by an unchallenged jury verdict. Each of Defendants' arguments against the trial court's grant of SAA's second motion for partial summary judgment is either inadequately briefed or unpersuasive. Furthermore, the trial court did not err in trying the wrongful lien claim itself rather than putting it to the jury. Alleged inaccuracies in the amount of the assessments were irrelevant to the wrongful lien claim, and Defendants did not challenge the trial court's authority to evaluate those amounts. Because SAA has prevailed on appeal and was awarded attorney fees by the trial court, we also grant their request for reasonable attorney fees and costs on appeal. *See Pack v. Case*, 2001 UT App 232, ¶ 39, 30 P.3d 436 ("When a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." (citation and internal quotation marks omitted)). Accordingly, we affirm on all issues and remand for a calculation of SAA's attorney fees.

———————

10. Defendants ultimately reached a stipulation with SAA regarding the amount of assessments, in which SAA agreed not to levy future assessments for certain expenses challenged by Defendants and even granted Defendants a credit for past payments on some of those assessments.